Wesley M. Griffith, SBN 286390
John Roussas, SBN 227325
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone:    (916) 290-9400
Facsimile:    (916) 588-9330
E-mail:    wgriffith@cutterlaw.com
Email:    jroussas@cutterlaw.com

Karen Dahlberg O'Connell, *pro hac vice forthcoming*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, NY 10023
Telephone:    347-395-5666
E-mail:    karen@almeidalawgroup.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES CHOWNING, ADAM FITZGERALD, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TYLER TECHNOLOGIES, INC., DOES 1-20. <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> Jury Trial Demanded |

## **INTRODUCTION**

1.    This case seeks to hold Defendant Tyler Technologies, Inc. ("Tyler Technologies")—a multibillion dollar, out of state government contractor—responsible for forcing Californians to pay Ticketmaster-style Junk Fees to access state parks and other public lands.

2.    In December 2023, Tyler Technologies was awarded a 10-year contract by the California Department of Parks and Recreation ("Cal Parks") to design and operate ReserveCalifornia.com and other related booking interfaces (collectively, "Reserve California").[1] Tyler Technologies began operating Reserve California in August 2024.

---
[1] A copy of the contract received through a Public Records Act request is attached as **Exhibit A.** (the "Contract").

3.     Under the Contract, Tyler Technologies is "obligat[ed] to comply with federal and California laws and regulations" in designing, operating, and otherwise performing any services related to Reserve California. Ex. A at p. 326.[2]

4.     Despite this, Reserve California—as designed and operated by Tyler Technologies—does not comply with California law.

5.     Specifically, Reserve California's booking interface fails to include all mandatory reservation processing fees in the initial price displayed to consumers, and indeed, fails to add the mandatory reservation trade processing fees until the final check-out screens.

6.     Last minute, mandatory fees like those charged by Tyler Technologies are called "Junk Fees" by the Federal Trade Commission ("FTC"),[3] and this type of Junk Fee pricing strategy is commonly called "drip pricing" or "bait and switch" advertising.

7.     Junk Fees, drip pricing, and bait and switch advertising are all illegal in California.

8.     On October 7, 2023, California enacted law S.B. 478 (the "Honest Pricing Act"), which expressly banned Junk Fees by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A). The Honest Pricing Act became effective on July 1, 2024.

9.     The Honest Pricing Act further confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by *existing* statutes, including the Unfair Competition Law . . . and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

---

[2] All page number citations to the Contract refer to the page number when viewing Exhibit A as a PDF, which should align with the pagination added by the PACER system upon filing.

[3] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

10.    As former President Joe Biden explained before he left office, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills."[4]

11.    In fact, the Contract estimates that Tyler Technologies will make **$398 million** over the life of the contract in reservation processing fees—i.e., Junk Fees—charged to customers:

State of California
Department of Parks and Recreation

RFP C23073003
BAFO

**Tab #1. Forecast Summary**

| Item # | Description | SFY 23/24 | SFY 24/25 | SFY 25/26 | SFY 26/27 | SFY 27/28 | SFY 28/29 | SFY 29/30 | SFY 30/31 | SFY 31/32 | SFY 32/33 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Vendor Fees** | | | | | | | | | | |
| 1 | Camping Reservation-Based Transactions Go-Live Mandatory | | $ 6,930,079.00 | $ 6,826,509.53 | $ 7,322,939.25 | $ 7,659,360.96 | $ 8,515,790.70 | $ 8,812,228.43 | $ 9,900,650.15 | $ 9,905,087.88 | $ 10,301,517.60 |
| 2 | Camping Reservation-Based Transactions SOW Phase 1A Mandatory | | $ 7,431,003.40 | $ 8,067,693.00 | $ 8,654,382.75 | $ 9,241,072.43 | $ 9,827,762.10 | $ 10,414,451.78 | $ 11,001,141.45 | $ 11,587,831.13 | $ 12,174,520.80 |
| 3 | Camping Reservation-Based Transactions SOW Phase 1B Mandatory Optional | | $ 7,431,003.40 | $ 8,067,693.00 | $ 8,654,382.75 | $ 9,241,072.43 | $ 9,827,762.10 | $ 10,414,451.78 | $ 11,001,141.45 | $ 11,587,831.13 | $ 12,174,520.80 |
| 4 | Camping Reservation-Based Transactions SOW Phase 1B Mandatory Optional | | $ 7,431,003.40 | $ 8,067,693.00 | $ 8,654,382.75 | $ 9,241,072.43 | $ 9,827,762.10 | $ 10,414,451.78 | $ 11,001,141.45 | $ 11,587,831.13 | $ 12,174,520.80 |
| 5 | Tour Reservation-Based Transactions Go-Live | | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 | $ 3,640,725.00 |
| 6 | CA Boater Card | | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 | $ 81,250.00 |
| 7 | Quagga Zebra Mussel Sticker | | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 | $ 1,235,437.50 |
| 8 | Field Sales | | $ 1,301,525.39 | $ 1,344,475.73 | $ 1,388,043.43 | $ 1,434,675.26 | $ 1,482,019.54 | $ 1,530,926.19 | $ 1,581,448.75 | $ 1,633,634.50 | $ 1,687,544.43 |
| | **Forecasted Annual Fees** | | $ 35,032,027.09 | $ 37,331,476.80 | $ 39,652,343.43 | $ 41,894,874.01 | $ 44,238,517.84 | $ 48,543,922.44 | $ 48,850,941.79 | $ 51,159,628.25 | $ 53,470,036.93 |
| | **Forecasted Vendor Fee Grand Total** | $ 398,193,568.73 | | | | | | | | | |

Ex. A at p. 318.

12.    The deceptive nature of the Reserve California booking interface does not end with the last-minute addition of the Junk Fees.

13.    Instead, the entire Reserve California user interface designed by Tyler Technologies leads consumers to believe that the Junk Fees are being paid to Cal Parks, when in reality, the Junk Fees are kept by Tyler Technologies.

14.    There is not a single reference to Tyler Technologies or any entity other than Cal Parks throughout the entire reservation booking process.

15.    Plaintiff James Chowning's experience is instructive. Mr. Chowning is an experienced outdoorsmen, and enjoys bike-packing—riding his bike around the state and camping as he goes.

16.    Mr. Chowning made same day reservations through Reserve California in October 2024 for a campsite at San Onofre State Beach. The original price displayed to Mr. Chowning was $45. However, at checkout, in addition to the $45 use fee for the campsite,[5] he was charged an

---

[4]  The White House, *President Biden's State of the Union Address*, The White House, https://web.archive.org/web/20250106155151/https://www.whitehouse.gov/state-of-the-union-2023/ (last visited May 8, 2025).

[5]  On information and belief, use fees for campgrounds are eventually paid to and kept by Cal Parks

$8.25 reservation Junk Fee that (unknown to Mr. Chowning at the time) was paid to and kept by Tyler Technologies.

17.    The last-minute addition of the $8.25 Junk Fee at checkout reflected a price increase of 18% of the total sales price.

18.    Had Mr. Chowning known the true nature of the online Junk Fee, and that it was paid to Tyler Technologies, and not Cal Parks, Mr. Chowning would not have made the reservation through Reserve California, and instead would have attempted to pay directly in person to Cal Parks at San Onofre.

19.    The other plaintiff in this action, Mr. Adam Fitzgerald—along with hundreds of thousands, if not millions, of other Reserve California customers—have had materially identical experiences.

20.    This action seeks a return of the unlawfully charged fees from Tyler Technologies to Californians and other impacted consumers and seeks to force Tyler Technologies to engage in honest pricing that discloses the full price of reservations upfront and discloses the recipient of the Junk Fees: Tyler Technologies.[6]

21.    To be clear, Plaintiffs[7] do not seek any fee revenue retained by Cal Parks. Plaintiffs also do not seek any other remedies from Cal Parks. Only the Junk Fees kept by Tyler Technologies and Tyler Technologies' actions are at issue in this lawsuit.

## **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

22.    The District Court of the Northern District of California has personal jurisdiction over the parties in this matter because Mr. James Chowning resides in Alameda County and Mr.

---

to help maintain the campgrounds. Use fees, and any other revenue ultimately retained by Cal Parks, are not at issue in this lawsuit. Only Junk Fees retained by Tyler Technologies are at issue.

[6] At this time, Plaintiffs only seek monetary remedies under their Unfair Competition Law, Cal. Bus. Prof. Code, §§ 17200 *et seq.,* ("UCL"), False Advertising Law, Cal. Civ. Code §§ 17500 *et seq.,* ("FAL"), and unjust enrichment causes of action. Plaintiffs expressly reserve their right to amend this Complaint to seek monetary relief under California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), if Tyler Technologies does not correct its practices within 30-days of receiving a CLRA compliance letter, which Plaintiffs intend to send promptly after the filing of this Complaint.

[7] "Plaintiffs" refers collectively to James Chowning and Adam Fitzgerald.

-4-

Fitzgerald consents to the personal jurisdiction of this Court for purposes of this action. Tyler Technologies regularly conducts business within this District, including by charging the unlawful Junk Fees that are at issue in this litigation within this District.

23.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

24.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Mr. Chowning resides in Alameda County, and Tyler Technologies' unlawful actions, which are the subject of this action, occurred in Alameda County, among other locations within California.

25.    **Divisional Assignment:** Pursuant to Local Rules 3.2(c) and 3.5(b), Plaintiffs further state that assignment to the San Francisco and Oakland Division of this Court is proper because Mr. Chowning resides in Alameda County and certain of the events at issue in this lawsuit occurred in Alameda County, which pursuant to Local Rule 3-2(d) provides for assignment to this Division.

26.    Pursuant to California Civil Code Section 1780(d), a declaration from Mr. Chowning is attached as **Exhibit B**, confirming that venue is proper.[8]

## **THE PARTIES**

**A.    Plaintiffs**

27.    At all times relevant to this action, Plaintiff James Chowning was over the age of 18 and was a resident of Oakland, California.

28.    At all times relevant to this action, Plaintiff Adam Fitzgerald was over the age of 18 and was a resident of Yucaipa, California.

**B.    Defendants**

29.    Defendant Tyler Technologies, Inc. is a Delaware Corporation with its headquarters in Plano, Texas. Tyler Technologies regularly conducts business within the State and this District,

---

[8] Plaintiffs note that it is unlikely that this state law procedural requirement is valid in a federal action but have included a venue declaration in an abundance of caution. *See Berk v. Choy,* Supreme Court Case No. 24-440 (granting cert to resolve circuit split regarding whether state statute requiring declaration supporting a complaint is enforceable in a federal proceeding).

including by running Reserve California and charging the Junk Fees that are the subject of this litigation.

30.    On information and belief, Does 1-20 are individuals and/or entities who facilitate Tyler Technologies' unlawful Junk Fee practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiffs. The Doe defendants, along with defendant Tyler Technologies, are collectively referred to in this Complaint as "Defendants."

31.    Plaintiffs expressly reserve their right to amend this complaint to add the Doe defendants by name, once their identities are known.

## FACTUAL ALLEGATIONS

**A.    Companies Use Junk Fees to Trick Customers into Paying More than They Otherwise Would for Goods and Services.**

32.    Large, sophisticated companies—like Tyler Technologies—with large, sophisticated marketing departments know that Junk Fees ensure consumers pay more for a good or service than they otherwise would or should pay.

33.    Indeed, the White House estimates that Junk Fees cost consumers over $90 billion each year in the United States.[9]

34.    One of the most common Junk Fee pricing techniques is called "drip pricing," where a company does not disclose the total price of a product or service until late in the purchase process or incrementally discloses fees to the consumer throughout the transaction, after consumers have already expended time and effort and committed to the originally disclosed price.

35.    Once a consumer decides what to buy, he is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming his search.[10]

---

[9] The White House, *Readout of White House State Legislators Convening on Junk Fees*, The White House (April 24, 2024), https://web.archive.org/web/20250116070341/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (last visited May 8, 2025).

[10] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

36.     In other words, omitting Junk Fees from the advertised price induces consumers to pay a higher total price than they otherwise would have.

37.     Indeed, as the companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised disclosed "base price," and not based on the dripped price, especially when Junk Fees are not adequately disclosed.[11]

38.     Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[12]

39.     In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[13]

40.     As the FTC's Bureau of Economics has explained, the use of Junk Fees and drip pricing adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if presented with fully disclosed prices, including all applicable fees.[14]

41.     As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[15]

---

[11] Alexander Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers . . . . based their purchase decision exclusively on the base price") (last visited May 8, 2025).

[12] *Id.*

[13] Shelle Santa, Steven K. Dallas, and Vicki G. Morwitz, *Consumer Reactions to Drip Pricing*, Marketing Science (Jan. 15, 2020), at 189, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3924320 (last visited May 8, 2025).

[14] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 8, at 2-3.

[15] *Id.* at 4; *see also* David Friedman, *Regulating Drip Pricing*, 31 Stanford Law & Policy Review 51 (February 18, 2019), at 67, https://ssrn.com/abstract=3337073 (last visited May 8, 2025) ("sellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu *et al.*, *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

42.    The FTC has thus characterized Junk Fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine whether or not the cost is favorable compared to those prices listed by competitors.[16]

43.    Moreover, drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce"). And the FTC's guidance on bait and switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). If the first contact is secured by the deceptive bait advertisement, it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

44.    Given this, it is no surprise that companies are motivated to hide Junk Fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees brings in substantial revenue.

45.    In many instances, companies even compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying product or service itself.[17] As a result, the product or service appears cheaper to consumers than competitor's products or services, even though the total cost of the product or service, inclusive of Junk Fees, is equally if not more expensive than those other companies' products or services.[18]

---

[16] *See, e.g.*, Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

[17] *Id.*

[18] *See id.*

46.    Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[19] In particular, companies are free to charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition.[20]

47.    Hence, through drip pricing, companies can charge excessive Junk Fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a Junk Fee and its effect on the total price.

48.    Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip pricing will lure consumers away from honest competitors that do not engage in such practices (and thus appear to charge higher prices) and the dishonest companies will earn a larger share and make higher profits than those competitors.[21]

49.    Junk Fees charged through drip and/or partitioned pricing also generate significant burdens for individual consumers.[22]

50.    Put simply, Junk Fees and drip pricing are bad for consumers, are bad for businesses, and are bad for competition.

**B.    California's Junk Fee Ban.**

51.    Given the widespread use of Junk Fees, drip pricing, and bait and switch tactics in the online travel industry, in 2023, California took decisive action to protect its citizens.

52.    On October 7, 2023, California enacted the Honest Pricing Act, which expressly banned Junk Fees in California by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

---

[19] Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, *supra* note 9.

[20] *Id.* ("firms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

[21] *Id.* ("where there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[22] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) (explaining that "[c]onsumers faced with such fees pay upward of twenty percent more than when the actual price was disclosed upfront," and, as a result, such fees "impose substantial economic harms on consumers").

53.    The Honest Pricing Act further confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by *existing* statutes, including the Unfair Competition Law . . .  and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

54.    The key provisions of the Honest Pricing Act were added to California's Consumer Legal Remedies Act Cal. Civ. Code §§ 1750 *et seq.*, ("CLRA") at Section 1770(a)(29)(A). The CLRA provides robust enforcement tools for consumers, including:

     a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

     b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

     c.    Establishing a substantive right to litigate in the forum where the transaction occurred. *Id.* § 1780(d).

     d.    Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

     e.    Authorizing injunctive relief. *Id.* § 1780(a)(2)

     f.    Authorizing actual damages. *Id.* § 1780(a)(1).

     g.    Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

     h.    Authorizing punitive damages. *Id.* § 1780(a)(4).

     i.    Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

     j.    Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

     k.    Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

-10-

55.     To help guide businesses into compliance with the law, on May 8, 2024, the California Office of the Attorney General issued a robust set of "Frequently Asked Questions" about what the Honest Pricing Act requires of businesses.[23]

56.     Among other guidance, the Attorney General's FAQ, answers the following core questions:

Put simply, ***the price a Californian sees should be the price they pay.***

In order to help businesses comply with this new law, and to offer consumers guidance about what they can expect, the Attorney General's Office is releasing a set of FAQs. The law is found at Section 1770(a)(29) of the California Civil Code.

### What is the purpose of this law?

The law is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." Advertising or listing a price that is less than what a consumer will eventually be charged is a form of deceptive advertising that also violates existing state and federal law. Truthful price advertising and listing helps businesses compete fairly on price and allows consumers to make accurate price comparisons.

### What does the new law require?

The law requires honest pricing. It prohibits businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than government-imposed taxes or fees or reasonable shipping costs. The text of the law can be found at section 1770(a)(29) of the California Civil Code.

### What can a business exclude from the advertised price under this law?

The listed or advertised price does not need to include taxes and/or fees that the government imposes on the transaction, such as sales tax. In addition, the listed or advertised price does not need to include reasonable shipping costs for physical goods.

### Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction?

No. The price listed to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by advertising a price that is less than what a consumer will actually have to pay, but disclosing that additional fees will be added?

No. The price advertised to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by listing or advertising one price and separately stating that an additional percentage fee will apply?

No. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

### Can a business comply with this law by advertising the total price for a good or service and separately noting that the total price includes certain fees and charges?

Yes. The price advertised to the consumer must be the full price that the consumer is required to pay. But the law does not limit a merchant's ability to include fees or charges in that total price, or to tell consumers that its prices include those fees or charges.

### Does this law prohibit a business from advertising one price and adding a variable service fee later in the transaction?

Yes. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

57.     The Honest Pricing Act became effective on July 1, 2024.

---

[23] https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last visited May 8, 2025).

**C.    Tyler Technologies' Decision to Ignore the California Junk Fee Ban.**

58.    Despite widespread media attention regarding the Honest Pricing Act, Tyler Technologies did not create a user interface on Reserve California that complied with the Junk Fee ban when it launched a re-designed website in August 2024.

59.    Despite having had over ten months to bring its practices into compliance since the law became effective in July 2024, Tyler Technologies still has not updated its practices.

60.    Despite California's Office of the Attorney General issuing public guidance on compliance in May 2024, Tyler Technologies still has not updated its practices.

61.    Despite many other companies bringing their practices into compliance over the past year, Tyler Technologies still has not updated its practices.

62.    Despite Tyler Technologies being contractually "obligat[ed] to comply with federal and California laws and regulations" in designing, operating, and otherwise performing any services related to Reserve California, Tyler Technologies still has not updated its practices. Ex. A at p. 326.

63.    Instead, Tyler Technologies has made a conscious decision to ignore California's Junk Fee ban, and to violate its Contract with Cal Parks.

**D.    The Reserve California Contract.**

64.    In December 2023, Tyler Technologies was awarded a 10-year contract by Cal Parks to design and operate Reserve California. A true and correct copy of the Contract received through a Public Records Act request is attached as **Exhibit A**.

65.    Under the Contract, among other things, Tyler Technologies agreed to:

a.    "[O]perate, support, maintain, integrate, modernize, and manage a department-wide Recreation and Reservations Sales Service (hereafter called the Service), consisting of two components: (1) the Recreation Sales (RS) service and (2) the Reservations Management (RM) service. These components shall be seamlessly integrated. The bidder's Service shall be a fully managed service . . ." Ex. A at 3.

b.     Design the website, including, the "[r]eservation process flow" and "[u]ser interface design." Ex. A at 48-49; 239.

c.     Provide a "recreation platform [that] will include a new, fully integrated payment system provided, operated, and managed by Tyler, the leader in public-sector payment processing." *Id.* at 427.

66.     In performing these functions, the Conract requires Tyler Technologies to comply with federal and state law:

> In addition, it is expressly agreed and understood that any approval by the State of the services, products, programs, and activities provided by the Contractor, pursuant to this Contract, will not relieve the Contractor of its obligations to comply with federal and California laws and regulations and to indemnify, defend, protect, and save harmless the State pursuant to this clause.

Ex. A at 325- 326.

67.     In exchange, Cal Parks "agreed to compensate the Contractor [with] the eligible reservation-based transaction fees"—in other words, allowing Tyler Technologies to keep the Junk Fees. Ex. A at 169.

68.     The Contract estimates that Tyler Technologies will make ***$398 million*** over the life of the contract in reservation processing fees—i.e., Junk Fees—charged to customers:



Ex. A at p. 318.

69.     Pursuant to the Contract, Tyler Technologies began operating Reserve California in August 2024, including a re-design of the user interfaces and the payment processing procedures that are at issue in the litigation.

70.     The Reserve California webpage may be branded as "Cal Parks" to the public, but the reality is that Reserve California is a money grab for Tyler Technologies.

-13-

1    **E.    Tyler Technologies' Standardized Booking Interface.**

2        71.    Reserve California, as designed and operated by Tyler Technologies, uses a

3    standardized booking interface.

4        72.    Here is how the booking interface appears from a desktop computer.

5        73.    First, the user begins on the Reserve California landing page, where she is directed

6    to search for a location:



7

8

9

10

11

12        74.    After the user enters a location, she is directed to choose among campgrounds,

13    campsite types, dates, and other information:



14

15

16

17

18

19        75.    On the next page, the user receives a list of available campsites on her preferred

20    date, with associated pricing information. In this example, the price displayed is $35 per campsite:

21

22



23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

76.    However, unknown to the user, there is actually no way to complete the transaction for the $35 price that is quoted.

77.    Relying on the pricing information that is provided, the user then selects a campsite, where, once again, the price of $35 is re-stated:



/ / /

/ / /

/ / /

-15-

78.    After pressing "book now," the user is taken to the first of several checkout pages. The first checkout page is titled "reservation details," and requests additional information from the user. Regardless of how the information is filled out, the only pricing information displayed continues to reflect that the campsite is $35:

1    79.    After filling out the additional information and pressing "reserve unit" the user is

2  taken to another checkout page. For the first time, the full price of the campsite is displayed, with

3  a "reservation fee" added in the amount of $8.25, bringing the total price to $43.25, a price increase

4  of 24%:



18    80.    In an effort to prevent the consumer from further investigating the last-minute

19  addition of the Junk Fee, the page includes a countdown clock in the top right corner to create a

20  false sense of urgency to complete the transaction.

22  / / /

24  / / /

26  / / /

81.    The next and final screen prompts the user to input her credit card and reflects the total price of $43.25. The Junk Fee breakdown is not provided, but once again, the countdown timer persists, creating a false sense of urgency to finalize the transaction and not investigate the fee:



82.    Throughout the transaction process, the Cal Parks name and logo are displayed on the user interface.

83.    Throughout the booking process, there is never any disclosure that the reservation fee—i.e., the Junk Fee—will be paid to Tyler Technologies, and not Cal Parks.

84.    The booking process is materially identical when made on a mobile device, as reflected in Paragraphs 90 to 100, below.

**F.    Plaintiffs' Experiences with Tyler Technologies.**

85.    Plaintiffs Mr. Chowning and Mr. Fitzgerald are each citizens of California who have been subjected to Tyler Technologies' predatory Junk Fee practices.

**1.    James Chowning**

86.    Plaintiff James Chowning is an experienced outdoorsmen, and enjoys bike-packing—riding his bike around the state and camping as he goes.

-18-

87.     In October 2024, Mr. Chowning made a same day reservation through Reserve California for a campsite at San Onofre State Beach. The price initially quoted on Reserve California for the campsite was $45. However, at checkout, he was charged an $8.25 reservation fee, for a total of $53.25.

88.     The last-minute addition of the $8.25 Junk Fee at checkout reflected a price increase of 18% of the total sales price.

89.     Had Mr. Chowning known the true nature of the Junk Fee, and that it was paid to Tyler Technologies, and not Cal Parks, Mr. Chowning would not have made the reservation through Reserve California, and instead would have attempted to pay in person directly to San Onofre State Park.

90.     Here is how the booking interface would have appeared to Mr. Chowning, who made his reservation on a mobile device.

91.     First, Mr. Chowning would have started on the Reserve California landing page, where he was directed to search for his desired location:



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

92.    Next, after typing in San Onofre, Mr. Chowning was prompted to select a date and location:

 

93.    On the next page, Mr. Chowning received a list of available sites on his preferred date, with associated pricing information, reflecting $45 per campsite:



-20-

1    94.    Mr. Chowning then selected a campsite, where, once again, the price of $45 was re-

2  stated:



95.    Relying on the quoted price, Mr. Chowning continued with the transaction.

/ / /

/ / /

/ / /

96.     After pressing "book now," Ms. Chowning was taken to the first of several checkout pages. For the first time, buried in small font at the bottom of the page, the $8.25 fee is listed separate and apart from the price of $45 for the campsite:



97.     Nothing on this page made clear that the $8.25 was an additional fee, as opposed to part of the already quoted rate of $45.

/ / /

/ / /

/ / /

-22-

1

98.    After filling out additional information and pressing "reserve unit" Mr. Chowning

2   was taken to a checkout page. For the first time, the true price of the campsite—$53.25—was

3   displayed:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



24   99.    By this time, Mr. Chowning had already committed considerable time selecting a

25   location, a campground, a campsite type, and provided other details related to his stay.

26   / / /

27   / / /

28   / / /

100.    The next and final screen prompted Mr. Chowning to input his credit card and reflects only the total price of $53.25. The Junk Fee breakdown is not provided:



101.    Throughout the transaction process, the Cal Parks name and logo were displayed, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—would be paid to Tyler Technologies.

### 2.    Adam Fitzgerald.

102.    Mr. Fitzgerald enjoys camping, and frequently stays at campgrounds near the ocean, lakes, and rivers to go fishing.

103.    Mr. Fitzgerald made reservations through Reserve California in October 2024 for a campsite in Crystal Cove State Park Moro Campground.

104.    Mr. Fitzgerald was originally quoted a price of $75.00 for the reservation. However, at checkout, he was charged an additional $8.25 reservation Junk Fee that was paid to and kept by Tyler Technologies.

105. Had Mr. Fitzgerald known the true nature of the Junk Fee, and that it was paid to Tyler Technologies, and not Cal Parks, Mr. Fitzgerald would not have made the reservation through Reserve California.

106. Here is how the booking interface would have appeared to Mr. Fitzgerald from a desktop computer.[24]

107. First, Mr. Fitzgerald would have started on the Reserve California landing page, where he would have been directed to search for his desired location:



108. Next, Mr. Fitzgerald, was prompted to select a date and location, followed by the option to select a campground:





---

[24] Mr. Fitzgerald's actual reservation was made on a mobile device, where the representations he saw were substantively identical. But for illustrative purposes, a desktop version is included here.

1

2

109.    On the next page, Mr. Fitzgerald received a list of available sites on his preferred date, with associated pricing information:

3

4

5

6

7

8



9

10

110.    While the page reflected campsites "starting at $55," the only campsites that were actually available were $75.

11

111.    Mr. Fitzgerald then selected a campsite, where the price of $75 was displayed:

12

13

14

15

16

17

18

19

20



21

22

23

24

25

26

112.    Relying on the price displayed, Mr. Fitzgerald proceeded with the reservation.

27

28

113.    After pressing "book now," Mr. Fitzgerald was taken to the first of several checkout pages:



114.    The price of $75 continued to be listed and Mr. Fitzgerald continued to rely on that price.

115.    After filling out additional information and pressing "reserve unit" Mr. Fitzgerald was taken to an additional checkout page. For the first time in the transaction, the $8.25 reservation fee was included, and the full price of the campsite increased from $75 to $83.25:



116.    By this time, Mr. Chowning had already committed considerable time selecting a location, a campground, a campsite type, and provided other details related to his stay.

117.    The next and final screen prompted Mr. Fitzgerald to input his payment information, and while the full price of $83.25 is listed, the Junk Fee is not separately broken out:



118.    Throughout the transaction process, the Cal Parks name and logo were displayed, and there was never any disclosure that the reservation fee—i.e., the Junk Fee—was going to be paid to Tyler Technologies.

-28-

## CLASS ALLEGATIONS

119.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

120.    Plaintiffs seek certification of the following class (the "Class"):

> All persons who were charged a reservation processing fee or other similar mandatory transaction fee by Tyler Technologies that exceeded the originally displayed price for a transaction made through Reserve California.

121.    Tyler Technologies' deceptive Junk Fee practices violated each Class member's individual statutory right to truthful information from Tyler Technologies about the actual price of reservations made on Reserve California.

122.    Tyler Technologies' deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of Tyler Technologies' illegal Junk Fee practices.

123.    Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

124.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

125.    **Numerosity.** Plaintiffs are informed and believe that there are hundreds of thousands or potentially millions of members of the Class. The Class is so large that the joinder of

all of its members is impracticable. The exact number of members of the class can be determined from information in the possession and control of Tyler Technologies.

126.    **Commonality.** Tyler Technologies has acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Tyler Technologies. Numerous common issues of fact and law exist, including, without limitation:

  a. Whether Tyler Technologies is a "person" within the meaning of Section 1761(c).

  b. Whether Plaintiffs are "consumers" within the meaning of Section 1761(d).

  c. Whether Tyler Technologies' Junk Fee practices violate Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

  d. Whether Tyler Technologies' Junk Fee practices violate Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

  e. Whether Tyler Technologies' Junk Fee practices violate any other provisions of the CLRA.

  f. Whether Tyler Technologies' Junk Fee practices violate the UCL and/or the FAL.

  g. Whether Tyler Technologies is liable for unjust enrichment.

  h. Whether Tyler Technologies makes standardized representations to consumers.

  i. Whether Tyler Technologies charges standardized Junk Fees to consumers.

  j. The dates of Tyler Technologies' practices and any purported changes to those practices.

127.    **Predominance.** These common issues predominate over individualized inquiries in this action because Tyler Technologies' liability can be established as to all members of the Class as discussed herein.

128.    **Typicality.** Plaintiffs' claims against Tyler Technologies and experience with Tyler Technologies are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiffs' claims arise from Tyler Technologies' practices that are applicable to the entire Class.

129.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money by paying Junk Fees to Tyler Technologies. Plaintiffs also have no interests antagonistic to those of the Class, and Tyler Technologies has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

130.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

131.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

1

2

3

## CAUSES OF ACTION

A.    **First Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, on Behalf of Plaintiffs and the Class.**

4

5

132.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 131, inclusive, of this Complaint.

6

7

8

133.    At all relevant times, Plaintiffs and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

9

10

11

12

134.    Tyler Technologies' actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of camping reservations and charging mandatory Junk Fees that exceeded the price initially advertised and/or displayed to consumers.

13

14

15

135.    Tyler Technologies violated the CLRA by, among other things, making materially false statements and omitting truthful information about the Junk Fees charged to Plaintiffs and the Class.

16

17

18

19

136.    Specifically, Tyler Technologies violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)(29)(A), which prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

20

137.    Additionally, Tyler Technologies violated the CLRA by:

21

a.    "Passing off goods or services as those of another" (a)(1);

22

23

b.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

24

25

c.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

26

27

d.    **"**Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

28

e.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14); and

f.    "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20).

138.    Tyler Technologies' actions and misrepresentations were material, and Tyler Technologies' violations of the CLRA were a substantial factor in causing Plaintiffs and the Class to incur the Junk Fee charges.

139.    As a direct and proximate consequence of these actions, Plaintiffs and the Class suffered injury.

140.    Tyler Technologies' conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiffs and the Class for Defendants' own benefit to the detriment of Plaintiffs and the Class.

141.    At this time, Plaintiffs only seek injunctive and declaratory relief for their CLRA cause of action.[25]

**B.    Second Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, on Behalf of Plaintiffs and the Class.**

142.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 131, inclusive, of this Complaint.

---

[25] Pursuant to Section 1782(d) of the CLRA, Plaintiffs expressly reserve their right to amend their CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing Tyler Technologies the notice contemplated by Section 1782(a).

143.     Tyler Technologies, Plaintiffs, and Class are "persons" within the meaning of the UCL.

144.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

145.     Tyler Technologies' practices of charging Junk Fees are "unlawful" within the meaning of the UCL because, among other things, those Junk Fees violate the CLRA, with Section 1770(a)(9) prohibiting "[a]dvertising goods or services with intent not to sell them as advertised" and Section 1770(a)29(A) prohibiting "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges."

146.     The Junk Fees are also unlawful within the meaning of the UCL because they violate the False Advertising Act (as detailed in the Third Cause of Action, below) and also violate the FTC Act, as alleged above.

147.     The acts and practices of Tyler Technologies as alleged herein also constitute "unfair" business acts and practices under the UCL because Tyler Technologies' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Tyler Technologies' conduct outweighs any conceivable benefit of such conduct.

148.     Tyler Technologies has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into paying Junk Fees by failing to display those prices in the initially advertised prices.

149.     Tyler Technologies has, in the course of business and in the course of trade or commerce, charged these unlawful Junk Fees to Plaintiffs and the Class.

150.     Plaintiffs and the Class have suffered injury in fact—in the form of Junk Fees—and have lost money as a result of Tyler Technologies' unlawful business acts and practices and will continue to lose money and be injured by those acts and practices if the practices are not enjoined.

151.     Plaintiffs and the Class seek an order providing restitution and disgorgement of all Junk Fees paid to Tyler Technologies.

152.    Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**C.    Third Cause of Action: Violation of California's False Advertising Law, Cal. Civ. Code §§ 17500 *et seq.*, on Behalf of Plaintiffs and the Class.**

153.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 131, inclusive, of this Complaint.

154.    In violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, Tyler Technologies' advertisements, policies, acts, and practices described in this Complaint were designed to cause Plaintiffs and the Class to pay Junk Fees to Tyler Technologies, and did in fact result in Plaintiffs and the Class paying unlawful Junk Fees to Tyler Technologies.

155.    Tyler Technologies knew or reasonably should have known that representations on Reserve California were false and deceptive.

156.    Specifically, as alleged in this Complaint, Tyler Technologies' unfair, unconscionable, deceptive acts, practices, omissions, and/or affirmative misstatements include, but are not limited to displaying and advertising an initial price for which a consumer could not actually complete the transaction.

157.    As a result, Plaintiffs and the Class are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Tyler Technologies was unjustly enriched.

158.    Plaintiffs and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiffs and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**D.    Fourth Cause of Action: Unjust Enrichment, on Behalf of Plaintiffs and the Class.**

159.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 131, inclusive, of this Complaint.

160.    To the detriment of Plaintiffs and the Class, Tyler Technologies has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

161.    Plaintiffs and the Class conferred a benefit on Tyler Technologies when they paid Tyler Technologies the Junk Fees, which was charged in contravention of applicable law, and which they could not reasonably avoid.

162.    Tyler Technologies unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Tyler Technologies to retain.

163.    Tyler Technologies' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

164.    Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Tyler Technologies as a result of its inequitable conduct as more fully stated herein.

## **PRAYER FOR RELIEF**

165.    WHEREFORE, Plaintiffs and members of the Class seek an Order:

a.    Certifying the proposed Class pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b.    Declaring that Tyler Technologies is financially responsible for notifying the Class members of the pendency of this suit;

c.    Declaring that Tyler Technologies has committed the violations of law alleged herein;

d.    Providing for any and all injunctive relief the Court deems appropriate;

e.    Awarding statutory damages in the maximum amount for which the law provides;

f.    Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

g.    Providing for any and all equitable monetary relief the Court deems appropriate;

h.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

1             i.        Awarding Plaintiffs their reasonable costs and expenses of suit, including

2  attorney's fees;

3             j.        Awarding pre- and post-judgement interest to extent the law allows; and

4             k.       Providing such further relief as this Court may deem just and proper.

5  Respectfully submitted,

6

7  Dated: May 8, 2025

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
John Roussas, SBN 227325
**CUTTER LAW P.C.**[26]
401 Watt Avenue
Sacramento, CA 95864
Telephone:    (916) 290-9400
Facsimile:    (916) 588-9330
E-mail:      wgriffith@cutterlaw.com
Email:       jroussas@cutterlaw.com

Karen Dahlberg O'Connell, *pro hac vice forthcoming*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, NY 10023
Telephone:    347-395-5666
E-mail:      karen@almeidalawgroup.com

---

[26] Mr. Griffith will be joining the Almeida Law Group effective May 12, 2025, but as of the time of this filing on May 8, 2025, is with Cutter Law P.C.

1

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs, on behalf of themselves and the putative class, hereby respectfully demand a

trial by jury on all claims for which a jury trial is available.

Dated: May 8, 2025

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
John Roussas, SBN 227325
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone:    (916) 290-9400
Facsimile:    (916) 588-9330
E-mail:        wgriffith@cutterlaw.com
Email:        jroussas@cutterlaw.com

Karen Dahlberg O'Connell, *pro hac vice forthcoming*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Floor
New York, NY 10023
Telephone:    347-395-5666
E-mail:        karen@almeidalawgroup.com

-38-